Gueen, J.
delivered the opinion of the court, (a)
The principal question which has been debated in this cause, is, as to the proper construction to be given the saving in the act of 1715, ch. 27, sec. 9. For the plaintiff in error, it is contended, that where there are several persons entitled to a joint action, and any one of them be-' ing free from disability to sue for three years, next before suit brought, the statute runs against him, and all are barred. On the other side, it is contended, that in such case, if all are under a disability at the time the action accrues, the statute does not Tun against any, until the disability shall have been removed as to all.
We have listened with interest to the very elaborate and able arguments which have been made on both sides of this question. The case comes before this court for the first time, and the question, as now presented, seems not to have been considered in any previous adjudication* either in England or the United States. The decision *8 must therefore mainly depend upon the meaning of the language used m the statute, as but little aid is afforded from other sources.
Arguments of inconvenience have been urged upon the court, on both sides, as calculated to have an influence on the determination of the cause. These considerations may properly enough be taken into view, in cases where the language of an act is so ambiguous as to render its meaning doubtful; especially where there is a great preponderance of inconvenience on one side. But in this case, arguments of inconvenience can have little or no influence. Upon the construction of the statute of limitations, whichever way we turn, hardships and inconveniences stare us in the face; and probably, no case' can be put on the one side, but what it may be met by one equally hard and inconvenient on the other. In the case before us for instance: on the one side it is said, if the plaintiff’s construction shall prevail, the intention of the legislature to put a stop to litigation and give repose to the country,is frustrated; and on the other hand it is urged, that the defendant’s construction would equally frustrate the intention the legislature had in view, ‘to save the rights of helpless infancy.
The defendant’s counsel urge, that if an action accrue to several infants, and one arrive at age the next day, it is absurd to say he is not barred until all arrive at age;’ when if the action had fallen one day after he had arrived at age, all would have been barred. To this it is replied, that it is equally absurd, that if an action accrue to a party, and he die the next day, leaving an infant only a day old, that infant is barred, although he would not have been, had his father died one day earlier. It must be seen, therefore, that arguments of inconvenience can have nothing to do in the construction of the clause in question; but regarding it as a question of positive law, we must see what the legislature have said, and abide by that. It may be well to consider in the outset, that the *9 legislature take the time when an action accrues as the period at which the disability is fixed. The condition of a party then, as being within a disability or not, must determine his rights and liabilities, and either save him from, or expose him to, the operation of the statute. Hence, if an action accrue to a man, and he shall die the next day, the act commences running against him, and must continue to run, though his representatives may be infants. So too, if one of several, entitled to a joint action, be over the age of twenty-one years at the time the action accrues, the statute runs against all, although the others are infants; because “they” who are entitled to the action were not under the age of twenty-one years, ■seeing one of them was not, and therefore none of them are within the saving. But if all the persons entitled to a joint action, are within the age of twenty-one years at the time such action accrues, then the action is within the saving, until ‘‘they” who are entitled to it shall become of full age. As the word “they,” in the former case, includes all those entitled to the joint action, and one of them not being within the age of twenty-one, all of them are excluded from the saving; so in the latter case, if all are within the age of twenty-one when the action accrues, and so are within the saving, all must continue within the saving so long as one of them remains under the age of twenty-one, for until then “they” have not attained “their” full age.
Strip this section of its description of parties and of actions, and apply it to this case, and it would read thus: “That if any person that is or shall be entitled to any such action of trover, be, or shall be, at the time any such cause of action given or accrued, fallen or come within the age of twenty-one years, that then such persons shall be at liberty to bring the same action, so as they bring the same within such times as are before limited after their coming to or being of full age, as other persons having no such impediment might have done.” Nothing could *10 more explicit than this language. The persons enti-tied to the action shall be at liberty to bring it alter “their” coming to full age. Can “they” who are enti-tied to the action, be said to be of full age, so long as one of'them is an infant? Certainly not. The word “they” describes all the individuals entitled to the joint action, therefore “they” who are thus entitled are not of full age so long as any one is an infant.
The case of Perry vs. Jackson, (4 Term Rep. 516,) does not oppose the view here taken, but on the contrary supports it. That was a case of several copartners; two of them had always remained in England, and one of them was in America when the action accrued, and until within six years before the suit was brought. The court there held, upon the clearest reason, that they were not within the saving on account of the absence of one, seeing two of them were in the country. Lord Kenyon, in giving judgment, observes, after quoting the saving clause of the statute of James, “Now the words of this clause, grammatically speaking, do not apply to the present cáse; they only extend to cases where the person, individually, a single plaintiff, or persons in the plural when there are several plaintiffs, are not in a situation to protect their interests.” From this intimation, if the "present case had been before the court, his lordship, I infer, would have decided the plaintiffs to be within the saving.
The case of Marsteller and others vs. M’Lean, (7 , Cranch, 156,) did present the question now before the court. But it is manifest that the distinction taken in this cause, between the cases where one is not under disability at the time the action accrues, and where all are, was not taken or thought of, either by the counsel who argued the cause, or the court. Lee, who argued for the plaintiffs, insisted that if some of them were under disability, they were not to be prejudiced by the negligence of others who were not disabled, and by proving all must join in the action, he supposed that all were saved. He made *11 no reference to the language of the exception, nor did he take any distinction between the case he was arguing and the case of Perry vs. Jackson. It is not to be wondered at, therefore, that Judge Story, in delivering the opinion of the court, should also pass the question over without notice. He says truly, that it is a “settled rule that all the plaintiffs must be competent to sue, other* wise the action cannot be supported.” But he did not consider whether Kitty Hunter’s competency to sue did " continue, notwithstanding her discoverture, it being preserved by the coverture and infancy of her co-plaintiffs; whether, as “they” were all disabled when the action accrued, “they” might not be permitted to sue after “their” discoverture aud coming of age. Had the question been agitated, it would have deserved and would have received some notice from the court; but we see it was content to rest the case upon the authority of Perry vs. Jackson, dissimilar as the two cases were in their features. Respectable, therefore, as is the supreme court of the United States, and much as its decisions ought to be regarded, this case cannot be considered as of controlling authority.
Of still less weight is the case of Ridon and others vs. Trion, (3 Murphy’s Rep. 577,) to which the observation may also be applied, that the question was not made. Indeed, it is wholly uncertain whether it could have been raised or not, the reporter only telling us that “two of the children had been of full age more than three years after the defendant got possession of the ne-groes.” The case does not show whether they were infants at the time the defendant got possession of the negroes, or not, and of course does not present the question. The conclusion is, that the authorities relied on for a contrary construction to that herein before indicated, of the saving in our act of 1715, are not of a character that ought to induce this court to yield the opin- *12 jon ft may entertain of the true meaning of the language ^
It is argued, that the concluding sentence of the section under consideration, “as other persons having no-such impediment might have done,” explains the fore» going provision, and shows the intention of the act to be that all should be barred, if one shall have arrived at full age three years before the suit brought. The force of this argument is not perceived. This sentence only means, that although more than three years may have elapsed since the action shall have accrued, yet those under any of the disabilities, shall be permitted to bring their action within three years after the disability may be removed, “as other persons having no such impediment might have done,” within three years after the action accrued. It is not intended, nor does its natural import affect the ques-r tion, whether the disability of one being removed, all are without the benefit of the saving.
2. It is insisted that the right of action in this case did not accrue, until there was a conversion of the property by Shute, the plaintiff in error, because, being sued for his own conversion, the right of action only relates to the time when that conversion took place, and cannot relate to the previous conversion by Stump.
It is true, Shute could- not have been sued' until he converted the property; but the' question is, not as to when the right of action against him accrued, but when did a right of action accrue for the slaves in controversy. If Stump had possessed the slaves adversely more than three years, and suit had been brought against Shute in ten days after his conversion, it would hardly have been conceded by him that the statute of limitations did not apply. Stump’s adverse possession for three years, (there being no impediment on the part of the plaintiffs to sue,) would have conferred on him a good title to the slaves; and Shute, claiming under him, would have had the benefit of his possesesion, and consequently a good title. Kegler *13 vs. Miles, Martin and Yerger's Rep. 426. We are to consider, therefore, when the right of action accrued lor the slaves in controversy, and not when Shute was first liable to be sued for them, as the time when the action accrued within the meaning of the statute.
3. It is next insisted, that the negroes were given or loaned by M’Donald to Mrs. Stubbs for life, and that the remainder after her death, was at that time given by him to the male children of Sally Wade, and that said gift vested the estate in George Wade, one of the plaintiffs, only, he being in esse at that time, but could not take effect as to the other plaintiffs, who were born after-wards, and consequently they have no right to maintain this action.
This leads us to an examination of the proof upon this subject.
The first witness on this subject, D. M’Donald, says, that Middleton M’Donald, having purchased the negroes at sheriff’s sale, had loaned them to his sister, Élenor Stubbs, who had possessed them for several years, when being about to move to Tennessee with George Wade, who had married her neice, a daughter of Middleton M’Donald, she was stopped by M’Donald, who forbid her carrying the negroes away with her; after some dispute, “it was finally agreed between them that she might carry the negroes with her to Tennessee, and keep them during her life, and that after her death they should go to the male children of Sally Wade.” The next witness, Mary M’Donald, wife of the former witness, testifies to the same effect, and nearly in the same words. George Wade, the father of the plaintiffs below, is the only remaining witness who speaks upon this subject. He says, “when Mrs. Stubbs was about coming to this State with witness’s family, Middleton M’Donald was at first unwilling that she should bring the negroes with her, and stopped her, and after some dispute they agreed that she should keep them during her life, and then they should go to the *14 male children of witness’s wife Sally. Mrs. Stubbs re- , . . . , . . . . rc . quested M Donald to give her a writing to that eitect, which he did do. Witness read the writing, and has seen it since in possession of Mrs. Stubbs, in this State, but knows not what has become of it; it was witnessed by Thomas Wade and David Kooser, both of whom are dead.” Being cross examined, states, “he does not distinctly recollect the contents of the writing, but thinks it stated that Mrs. Stubbs was to have said negroes on loan during her life, but subject to the demand of Middleton M’Donald. He thinks there was something said about marriage.”
Upon this evidence it is insisted the negroes were then given by Middleton M’Donald to the male children of Sally Wade. It is manifest that the object of the conversation and agreement between Mrs. Stubbs and M’Donald, related to her possession of the negroes, and his title to them; and when he agreed she might bring them to Tennessee, and keep them during her life, saying, then they should go to the male children oí Sally Wade, the writing to that effect, which Mrs. Stubbs wanted, was the assurance that she should be permitted to keep them during her life. That was the subject about which she was interested, and the only one in relation to which she wished a writing; and consequently, when the witness comes to speak of the contents of the writing actually given, we are told that it contained “a loan during her life, but subject to the demand of Middleton M’Donald.” Not one word is said in it about the children of Sally Wade, not even the expression of any intention in relation to them. It is true, this witness does not distinctly “recollect the contents of the writing,” but as Mrs. Stubbs could have had no solicitude, other than to secure for herself the enjoyment and possession of the negroes, it is not probable, that in a writing given to her for that object, any limitation over to others would have been contained, especially as it was only a loan to her, subject to the de~ *15 mand of M’Donald. Doubtless, M’Donald was induced to permit her to carry the negroes to Tennessee, on account of the fact, that she was to go in company with his daughter, for whom he would have to make-provision at some futufe time, and these negroes-would be a suitable fund out of which to make that provision. He, therefore, no doubt did say in the conversation with Mrs. Stubbs, previously to the execution of the writing, that he intended these negroes as a provision for the male children of his daughter Sally; but when he cometo give Mrs. Stubbs the writing, the language used had reference only to the benefit he intended to confer upon her. ‘ He expressly retains the title in himself, which does not consist with a limitation over to others; and therefore no such limitation is contained in the writing. Consistently with this view of the subject, Middleton M’Donald, by his will executed in 1810, devised these very negroes to the plaintiff’s below. This will, in our view, is the first act of his by which he parted with the property in these negroes.— At its date all the plaintiffs were in being; so that in the view here taken, the question so much debated, whether the whole estate did not vest in George Wade, the oldest of the plaintiffs, is not raised by the facts of the case.
Upon the whole, we are all of opinion that there is no error in the record, and that the judgment ought to be affirmed.
Judgment affirmed.

 Absent, Catron, Ch. J.